Filed 3/25/21  Nalick v. Seagate Technology LLC CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SCOTT NALICK,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>SEAGATE TECHNOLOGY LLC,<br><br>    Defendant and Respondent. | A158237<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-15-547787) |

Following class certification of plaintiff Scott Nalick's causes of action for violations of the California Consumer Legal Remedies Act (Civ. Code, § 1750 et seq.; CLRA) and California's unfair competition law (Bus. & Prof. Code, § 17200 et seq.; UCL), pursuant to an omissions-based theory of liability, defendant Seagate Technology LLC (Seagate) moved for summary judgment.  The trial court initially denied the motion in its entirety, concluding operative law authorized Nalick to pursue the claims at issue, and triable issues of material fact existed as to the threshold of materiality for a hard drive's annual failure rate (AFR) and Seagate's knowledge of such AFR's.

The trial court subsequently reconsidered and reversed its prior decision.  The court affirmed its prior conclusion that prewarranty CLRA and UCL class claims could be pursued based on Seagate's alleged failure to disclose high AFR's for its hard drives.  However, it concluded on

reconsideration that the evidence only indicated a 3 percent AFR would be material to consumers, and Nalick failed to demonstrate Seagate had exclusive knowledge of such an AFR in connection with its hard drives.

On appeal, Nalick contends the trial court improperly concluded Seagate's duty to disclose did not apply to postwarranty claims under the CLRA and UCL. He further contends the record demonstrates AFR's as low as 1 percent are material, and Seagate had knowledge of significantly higher AFR's for its drives. We agree and reverse the order granting summary adjudication.

## I.  BACKGROUND

### A.  Factual Background

Seagate manufactures certain internal and external hard disk drives identified as "ST3000DM001." Seagate stated its internal drive provided "trusted performance, reliability, simplicity and capacity." Seagate's website highlighted the drives' "Proven quality and performance," and it disseminated reliability specifications that claimed its annual failure rate (AFR) was less than 1 percent. Regarding its external drives, Seagate claimed the drives would "protect" and keep "safe from loss" a user's digital life and memories.

Nalick purchased a Seagate Backup Plus Drive, which contains a ST3000DM001 drive. Nalick asserts the drive failed approximately one year after his purchase, and he could not retrieve his data.

### B.  Procedural Background

Nalick filed a class action complaint, alleging the ST3000DM001 drives contained a latent defect that caused them to fail at high rates resulting in

2

data loss.[1]  The operative second amended complaint asserted Seagate's misrepresentations and omissions about the drives' reliability and failure rates violated the CLRA, the UCL, California's false advertising law (Bus. & Prof. Code, § 17500 et seq.; FAL), and the Song-Beverly Consumer Warranty Act (Civ. Code, § 1790 et seq.; Song-Beverly Act).

### 1. *Class Certification*

Following discovery, Nalick filed a motion for class certification.  The motion asserted the class[2] should be certified for the alleged violation of the Song-Beverly Act, the "fraudulent" prong of the UCL based on representations regarding the drives' reliability and omissions regarding the drives' failure rates, the CLRA based on concealing the drives' failure rates, the "unfair" prong of the UCL, and the "unlawful" prong of the UCL based on the Song-Beverly Act and CLRA violations.  Seagate opposed the motion.

The trial court granted the class certification motion in part, "limited to CLRA and UCL (but not the illegal prong) claims based on omissions."  The trial court explained the Song-Beverly Act only applied if title passes in California, which created individualized issues and thus was not appropriate for certification.  In limiting certification to claims "based on omissions," the

---

[1] The complaint was also brought by another individual plaintiff, Tim Pozar.  However, as part of its ruling on the class certification motion, discussed in part I.B.1., *post*, the trial court found Pozar's claims atypical and he could not serve as a class representative.  Pozar was dismissed from the case and is not part of this appeal.

[2] The motion identified the class as "All citizens of California who purchased a Seagate hard disk drive with model number ST3000DM001, or who purchased an external drive that contained an ST3000DM001 drive, on or after September 4, 2011."  It also identified a "Consumer Subclass."  The trial court noted the class definition was both under- and over-inclusive, but could be revised to address these issues.  The class definition is not at issue in this appeal.

court also concluded the record could not support a finding that the hard drives contained a latent defect or that common questions predominate as to any affirmative misrepresentations.

### 2. *Seagate's Motion for Summary Judgment*

Seagate subsequently filed a motion for summary judgment or, in the alternative, summary adjudication. In connection with the class claims at issue in this appeal, it argued Nalick failed to demonstrate either a latent defect or any affirmative misrepresentations, and his remaining omissions claims were barred by *Daugherty v. American Honda Motor Co., Inc*. (2006) 144 Cal.App.4th 824, 834 (*Daugherty*). Next, Seagate argued Nalick failed to establish a duty to disclose because there was no evidence of a sufficiently high AFR that would trigger any disclosure obligation. Likewise, Seagate argued there is no evidence of what level of AFR would be required to trigger a disclosure obligation. Seagate further asserted there is no evidence it was aware of or actively concealed any material information regarding a heightened AFR.

In support of its motion, Seagate submitted three declarations from various employees: Glen Almgren, the engineering director for Seagate's reliability group; Sek Nam "Allen" Ng, Seagate's director of customer technical support for the Americas Channel and Original Equipment Manufacturers; and David Trane, Seagate's executive engineering director of released products.

Almgren discussed the reliability demonstration testing (RDT) Seagate uses to qualify a drive for production and sale. Almgren explained the RDT process involved subjecting the drives to high stress, such as maximum workloads and increased temperatures. The data from the RDT was then used to calculate the mean time between/before failure (MTBF) and the AFR.

4

He asserted the drives at issue were all at or below a 1 percent AFR at the time of their release.

Ng recounted a recall issued by Apple for ST3000DM001 drives based on a cumulative return rate of around 5 or 6 percent, which would correspond to an annual return rate of "less than" 3 percent.

Trane's declaration discussed his role in reviewing and investigating return rate information on products, including the drives at issue. He summarized the cumulative return rates on the drives at issue at both 12 and 24 months, and noted many returned drives were marked as " 'no trouble found' " following postreturn testing. For the retail products, Trane noted the total retail returns over 12 months was slightly less than 4 percent, which decreased to a 2.22 percent return rate when Seagate removed the " 'no trouble found' " and " 'could not duplicate' " returns. He opined these were normal return rates for consumer products.

Seagate also submitted an expert declaration from Dr. Itamar Simonson, a professor of marketing at Stanford University. He conducted a marketing survey to determine the impact of an AFR of less than 8 percent as opposed to less than 1 percent. Participants were provided data sheets for two hypothetical hard drives with only the AFR changed. They were then asked to indicate the likelihood of buying each hard drive. Simonson stated the survey results indicated participants shown the higher AFR were not less or more likely to purchase the hard drive, and the participants' main focus was on other attributes such as capacity, ease of use, size, and brand.

Nalick opposed the motion. He argued *Daugherty* did not bar the class's omissions-based claims arising after a warranty period provided plaintiffs can prove a duty to disclose. Nalick asserted Seagate had such a duty to disclose because high AFR's were material to a reasonable consumer,

5

the drives' AFR's were consistently above 1 percent, and consumer demand decreases as the AFR rises above 1 percent. Nalick further asserted Seagate was aware the AFR was above 1 percent because it utilized improper methodology in its ongoing reliability testing (ORT) and provided overly optimistic projections on the impact of " 'fixes' " to known problems. He also contended the evidence demonstrated Seagate had a duty to disclose the high AFR's because of representations made by Seagate regarding the drives' reliability.

In support of his opposition, Nalick submitted three expert declarations. First, Nalick submitted a declaration by Robert L. Klein, cofounder of a market research and consulting firm. Klein critiqued the survey and report prepared by Simonson, noting it changed a single number on a two-page document without explaining the significance of that change, hid the nature of the omission by stating a failure rate of less than 8 percent, and failed to assess whether survey respondents noticed the changed AFR. Klein argued it "strains credulity under any common-sense test" that consumers would be equally likely to buy a hard drive with an AFR of 1 percent versus 8 percent.

Next, Nalick submitted an expert declaration from Stefan Boedeker, a statistician and economist employed as a managing director at the Berkeley Research Group. Boedeker developed an economic loss model to quantify the damages incurred by the class attributable to the purchase of hard drives with a higher AFR than 1 percent. He concluded, based on an empirical consumer study he conducted, an AFR above 10 percent would "quickly approach[ ] the sales price of the product and even exceed[ ] the sales price," while lower AFR's would result in economic loss at a lower rate. Boedeker calculated the estimated loss for AFR's of 3, 5, 8, and 10 percent,

6

corresponding to economic losses ranging from 16.9 percent to 75.4 percent, and noted "the model can be further refined to enable to quantification of economic losses for different interim AFR's."

Finally, Nalick submitted a declaration by Dr. Jon Garrett Elerath, a mechanical engineer with experience developing and evaluating reliability activities for hard disk drives. He opined the product AFR's at issue in this matter were substantially higher than 1 percent; Seagate employed flawed methodology in calculating the AFR's; the assumptions Seagate employed regarding the effectiveness of " 'fixes' " to known problems were flawed and resulted in erroneous recalculations of the product AFR's; the combination of the above issues resulted in AFR's that were actually 5 to 10 times greater than the values shown in prerelease testing; postrelease ORT resulted in AFR's regularly above 1 percent; Seagate accepted failure rates from ORT of up to 3 percent AFR and sometimes higher; Seagate employed flawed methodology to calculate postrelease AFR's and flawed analyses of ORT results; Seagate's prerelease test results were not consistent with postrelease ORT testing; and Seagate knew or should have known the true AFR's of the products were well above generally accepted industry standards.

The trial court initially denied the motion for summary judgment. In relevant part, the court concluded *Daugherty* did not completely bar Nalick's theory of liability because it only excluded claims for defects arising after the warranty period.

Next, the trial court addressed whether Seagate had knowledge of a materially heightened AFR. The court explained the evidence presented by Seagate—specifically Simonson's declaration—demonstrated the AFR's fell within the spectrum of consumer expectations.

7

The trial court next assessed Nalick's evidence and concluded he raised a dispute of fact as to whether an AFR higher than 1 percent would meet a reasonable consumer's expectations and whether Seagate knew its products exceeded that threshold. Specifically, the court found Klein's declaration sufficiently disputed Simonson's survey results and raised a factual dispute regarding the materiality of AFR's in excess of 1 percent. The court then noted, when applying the 1 percent AFR rate, Seagate's evidence raised triable issues of material fact by indicating at least some of the products had AFR's in excess of 1 percent. The court did not rely upon Elerath's and Boedeker's declarations and thus did not rule upon Seagate's objections to them.[3]

### 3. *Seagate's Request for Reconsideration*

Seagate subsequently requested that the court, sua sponte, reconsider its ruling on the summary judgment motion. As relevant to this appeal, Seagate argued Klein's declaration failed to create a triable issue of material fact because Klein only disputed Seagate's expert report, and Nalick presented no admissible evidence to indicate a 1 percent AFR was material to consumers. Nalick opposed the request.

The court agreed to reconsider its ruling, and the parties submitted supplemental briefs. In connection with the class claims, Seagate argued Nalick presented no admissible evidence regarding consumer expectations of AFR's. It argued he merely disputed Seagate's evidence, which was insufficient to raise a triable issue. Rather, Seagate contended, Nalick was

---

[3] The trial court also denied Seagate's summary judgment motion as to Nalick's individual claims. However, we do not address that portion of the ruling because it is not at issue on appeal.

required to introduce evidence that consumers considered an AFR of 1 percent to be material.

Conversely, Nalick asserted Seagate had not carried its burden because it failed to reference proof of materiality or Simonson's declaration in its separate statement. Nalick further asserted Simonson's survey was problematic and did not support his conclusions, and Nalick provided sufficient evidence of materiality so as to raise a triable issue of fact.

On reconsideration, the trial court granted Seagate's motion for summary adjudication of the class claims. Specifically, the trial court reconsidered its conclusion that a dispute of material fact existed regarding the products' heightened AFR's and Seagate's knowledge of such AFR's. First, the court noted it properly exercised its discretion to consider Simonson's declaration, despite its absence from the separate statement, because it was referenced in Seagate's opening brief and Nalick directly responded to the evidence. Next, the court affirmed its prior conclusion that Seagate carried its initial burden, noting, "The fact that a jury may reject Dr. Simonson's testimony does not render his opinion inadmissible or otherwise insufficient to satisfy Seagate's initial burden." Finally, the court reversed its prior ruling that the Klein testimony was sufficient to carry Nalick's burden because Klein did not present evidence regarding what level AFR would be material to a reasonable consumer.

The trial court then assessed the Boedeker and Elerath declarations[4] to determine whether they sufficed to carry Nalick's burden. On the question of

_____

[4] The Boedeker declaration was an exhibit to his deposition testimony, which was taken in a parallel federal case, and included in this matter via an attorney declaration. Our reference to Boedeker's declaration includes both his declaration and his deposition testimony.

9

materiality, the court noted Boedeker's declaration was admissible evidence that an AFR as low as 3 percent was material to a reasonable consumer. The court noted: "Boedeker used his survey data to analyze annualized failure rates between 1% and 10% through interpolation. [Citation.] Seagate has never argued or shown that Boedeker's application of interpolation was improper. Moreover, evidence that consumers would have paid less for a product if one attribute of the product were changed is evidence that the attribute is material."

Turning to the question of Seagate's heightened knowledge, the court first noted Seagate's evidence did not demonstrate knowledge of a failure rate above 3 percent. The court then determined Elerath's declaration did not carry Nalick's burden because "even construing Dr. Elerath's declarations liberally they do not contain a reasoned explanation connecting the factual predicates to the ultimate conclusions." The court thus granted summary adjudication of Nalick's class claims.

Nalick subsequently appealed from the court's order.

## II. DISCUSSION

Nalick contends the trial court improperly granted summary adjudication of the class claims because he adequately raised triable issues of material fact regarding Seagate's duty to disclose allegedly higher AFR's for those hard drives at issue. We agree and reverse.

### A. *Standard of Review*

" 'Summary adjudication motions are "procedurally identical" to summary judgment motions. [Citation.] A summary judgment motion "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [Citation.] To be entitled to judgment as a matter of law, the

10

moving party must show by admissible evidence that the "action has no merit or that there is no defense" thereto. [Citation.] A defendant moving for summary judgment meets this burden by presenting evidence demonstrating that one or more elements of the cause of action cannot be established or that there is a complete defense to the action. [Citations.] Once the defendant makes this showing, the burden shifts to the plaintiff to show that a triable issue of material fact exists as to that cause of action or defense. [Citations.] Material facts are those that relate to the issues in the case as framed by the pleadings. [Citation.] There is a genuine issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' " (*Duffey v. Tender Heart Home Care Agency, LLC* (2019) 31 Cal.App.5th 232, 240–241 (*Duffey*).)

" 'The trial court's ruling on a motion for summary adjudication, like that on a motion for summary judgment, is subject to this court's independent review.' [Citation.] 'In performing our review, we view the evidence in a light favorable to the losing party . . . , liberally construing [his] evidentiary submission while strictly scrutinizing the moving party's own showing and resolving any evidentiary doubts or ambiguities in the losing party's favor.' " (*Duffey, supra*, 31 Cal.App.5th at p. 241.) The court does not weigh evidence, but instead considers whether the evidence creates a triable issue of fact. (*Andrews v. Foster Wheeler LLC* (2006) 138 Cal.App.4th 96, 113.)

**B. Expert Declarations**

" '[A]n expert declaration is admissible to support or defeat summary judgment if the expert's testimony would be admissible at trial in accordance with Evidence Code section 720. An expert may testify to an opinion on a

11

subject "that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).)' " (*Fernandez v. Alexander* (2019) 31 Cal.App.5th 770, 779 (*Fernandez*).)

" 'The same rules of evidence that apply at trial also apply to the declarations submitted in support of and in opposition to motions for summary judgment. Declarations must show the declarant's personal knowledge and competency to testify, state facts and not just conclusions, and not include inadmissible hearsay or opinion.' " (*Fernandez*, *supra*, 31 Cal.App.5th at p. 779.) Pursuant to Evidence Code section 801, a trial court acts as a gatekeeper and should exclude any expert opinion that is based upon assumptions of fact without evidentiary support, or which involve guesses or surmises. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770 (*Sargon*).) Evidence Code section 802 permits a court to inquire into both the type of material on which an expert relies and whether that material actually supports the expert's reasoning. (*Sargon*, at p. 771.) In exercising its role as a gatekeeper, the trial court should exclude expert opinion testimony "that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative." (*Id*. at pp. 771–772; *Fernandez*, at p. 782 [liberal construction does not "eliminate the need for some form of 'reasoned explanation,' and it remains the case that any inferences must 'reasonably be derived from' the declaration"].) The trial court's focus should be " 'solely on principles and methodology, not on the conclusions that they generate.' " (*Sargon*, at p. 772.)

An appellate court reviews for abuse of discretion a trial court's ruling excluding or admitting expert testimony. (*Sargon*, *supra*, 55 Cal.4th at p. 773.)

## C.  Seagate's Motion for Summary Judgment or, Alternatively, Summary Adjudication

Nalick asserts the trial court erred in granting Seagate's motion on two grounds. First, Nalick contends the trial court improperly interpreted *Daugherty*, *supra*, 144 Cal.App.4th 824, as barring any omissions liability after the expiration of the warranty period. Second, Nalick contends his submitted evidence regarding materiality, Seagate's knowledge, and Seagate's representations regarding reliability adequately created genuine issues of material fact sufficient to defeat summary judgment.

### 1.  Duty to Disclose Under the CLRA and UCL

Civil Code section 1770, subdivision (a) makes unlawful certain "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer . . . ." (See *Daugherty*, *supra*, 144 Cal.App.4th at p. 833.) A deceptive act includes the misrepresentation or omission of a material fact. (*McAdams v. Monier, Inc*. (2010) 182 Cal.App.4th 174, 185.) For an omission to be actionable under the CLRA, it must be contrary to a representation actually made by the defendant, or the defendant must have had a duty to disclose the omitted fact. (*Daugherty*, at p. 835.) Moreover, the plaintiff asserting a CLRA claim must show the misrepresentation or omission was likely to deceive a reasonable consumer. (*Consumer Advocates v. Echostar Satellite Corp*. (2003) 113 Cal.App.4th 1351, 1361–1362.)

Similarly, "[c]onduct violating the UCL includes 'any unlawful, unfair or fraudulent business act or practice . . . .' (Bus. & Prof. Code, § 17200.)  By

13

proscribing unlawful business practices, the UCL borrows violations of other laws and treats them as independently actionable.  In addition, practices may be deemed unfair or deceptive even if not proscribed by some other law." (*Daugherty*, *supra*, 144 Cal.App.4th at p. 837.)  " 'A business practice is "fraudulent" within the meaning of [the UCL] if it is "likely to deceive the public.  [Citations.]  It may be based on representations to the public which are untrue, and ' "also those which may be accurate on some level, but will nonetheless tend to mislead or deceive. . . . A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under" ' the UCL.  [Citations.]  The determination as to whether a business practice is deceptive is based on the likely effect such practice would have on a reasonable consumer." ' " (*Rubenstein v. The Gap, Inc.* (2017) 14 Cal.App.5th 870, 876–877.)  " '[A] business practice is "unfair" if (1) the consumer injury is substantial; (2) the injury is not outweighed by any countervailing benefits to consumers or competition; and (3) the injury could not reasonably have been avoided by consumers themselves.' " (*Id.* at p. 880.)

Seagate contends *Daugherty* bars any omissions-only theory of liability in the absence of a defect, safety risk, or affirmative misrepresentation.  In *Daugherty*, *supra*, 144 Cal.App.4th 824, the Second Appellate District addressed whether American Honda Motor Co., Inc. (Honda) had a duty to disclose an engine defect that could cause an oil leak malfunction.  The court explained, "although a claim may be stated under the CLRA in terms constituting fraudulent omissions, to be actionable the omission must be contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose." (*Id.* at p. 835.)  The court first noted the plaintiff did not allege any representation regarding the

14

engine apart from its express warranties, and the engine "functioned as warranted." (*Id.* at pp. 836, 835.) Next, the court rejected the plaintiff's argument that Honda had a duty to disclose because it knew of " 'unreasonable risk.' " (*Id.* at p. 836.) The court explained the " 'unreasonable risk' alleged is merely the risk of 'serious potential damages'—namely, the cost of repairs . . . . The complaint is devoid of factual allegations showing any instance of physical injury or any safety concerns posed by the defect."[5] (*Daugherty*, at p. 836.)

Contrary to Seagate's position, *Daugherty* did not bar omissions-only theories. Rather, *Daugherty* explained, as a general rule, a manufacturer cannot be liable for a failure to disclose unless such omission (1) is "contrary to a representation actually made by the defendant" or (2) pertains to a "fact the defendant was obliged to disclose." (*Daugherty*, *supra*, 144 Cal.App.4th at p. 835.) Courts have uniformly applied this general rule.[6] (See, e.g.,

---

[5] The court also rejected the UCL claim because the alleged failure to disclose did not involve a fact Honda was required to disclose because the only expectation Honda's buyers could have was that the engine would function for the length of Honda's express warranty. (*Daugherty*, *supra*, 144 Cal.App.4th at p. 838.) It also rejected the UCL claim on the "unlawful" and "unfair" prongs because there was no underlying statutory violation and the alleged injury to consumers is not substantial. (*Daugherty*, at pp. 837, 839.)

[6] Some federal courts have disagreed amongst themselves on whether the rule should be applied to claims arising after the expiration of a warranty period. (Compare *Daniel v. Ford Motor Co*. (E.D.Cal. May 18, 2016, Civ. No. 2:11-02890 WBS EFB) 2016 WL 2899026 at p. *2 [test applies to defects that manifest after expiration of the warranty period] with *Williams v. Yamaha Motor Co. Ltd*. (9th Cir. 2017) 851 F.3d 1015, 1029 ["the fact that the alleged defect concerns premature, but usually post-warranty, onset of a natural condition raises concerns about the use of consumer fraud statutes to impermissibly extend a product's warranty period"].)

*Gutierrez v. Carmax Auto Superstores California* (2018) 19 Cal.App.5th 1234, 1258 (*Gutierrez*); *Rubenstein v. The Gap, Inc.*, *supra*, 14 Cal.App.5th at p. 881.)  In fact, the two other cases cited by Seagate, *Bardin v. DaimlerChrysler Corp.* (2006) 136 Cal.App.4th 1255 (*Bardin*) and *Buller v. Sutter Health* (2008) 160 Cal.App.4th 981, both recognize the viability of omission-based claims when there exists a duty to disclose.  In *Bardin*, however, the court rejected the UCL and CLRA claims because the complaint failed to allege facts showing defendant was " 'bound to disclose' " its use of tubular steel exhaust manifolds because customers had no expectation or assumption regarding the materials used by the defendant.  (*Bardin*, at pp. 1275–1276.)  Similarly, in *Buller*, the court explained the complaint did not allege the defendants had an affirmative duty to disclose the availability of a discount because patients are unlikely to expect such discounts.  (*Buller*, at p. 988.)

The question before this court is thus whether Seagate had a duty to disclose the allegedly higher failure rates of its drives.  Courts are split as to whether the duty to disclose requires a "safety hazard" showing.  The Ninth Circuit, in *Wilson v. Hewlett-Packard Co.* (9th Cir. 2012) 668 F.3d 1136,[7] commented that unless liability for failure to disclose a defect is limited to unreasonable safety risks, "the '[f]ailure of a product to last forever would become a "defect," a manufacturer would no longer be able to issue limited warranties, and product defect litigation would become as widespread as manufacturing itself.' " (*Wilson*, at pp. 1141–1142.)  *Daugherty* also implicitly adopted the safety hazard position as to claims arising from an alleged duty

---

[7] While federal cases interpreting state law are persuasive, they are, of course, not binding on this court.  (9 Witkin, Cal. Procedure (5th ed. 2020) Appeal, § 507.)

16

to disclose when it noted, "The complaint is devoid of factual allegations showing any instance of physical injury or any safety concerns posed by the defect." (*Daugherty*, *supra*, 144 Cal.App.4th at p. 836.)

However, two post-*Daugherty* California Court of Appeal cases— *Rutledge v. Hewlett-Packard Co.* (2015) 238 Cal.App.4th 1164 (*Rutledge*) and *Collins v. eMachines, Inc.* (2011) 202 Cal.App.4th 249 (*Collins*)—cast doubt on whether plaintiffs must identify a "safety hazard" to state a claim for failing to disclose. These cases instead focus on whether the defect is "material" and central to the product's functionality. In *Collins*, the plaintiffs filed a class action alleging the defendant failed to disclose a microchip defect, which resulted in the computers improperly writing data to, and reading data from, floppy disks and related data corruption. (*Collins*, at p. 253.) In addressing whether the complaint stated claims for violating both the CLRA and UCL, the court explained "deceptive practices . . . include the concealment or suppression of material facts" because they encompass, in part, "the suppression of a fact by one who is bound to disclose it." (*Collins*, at p. 255.) The court further explained "a fact is deemed 'material,' and obligates an exclusively knowledgeable defendant to disclose it, if a ' "reasonable [consumer]" ' would deem it important in determining how to act in the transaction at issue." (*Id.* at p. 256.) The *Collins* court concluded the plaintiffs sufficiently alleged the materiality of the microchip defect because "the floppy disk was central to the function of a computer as a computer." (*Id.* at p. 258.)

Likewise, in *Rutledge*, a class action was brought alleging Hewlett-Packard Co. (HP) manufactured certain notebook computers containing inverters that HP "knew would likely fail and cause display screens to dim and darken at some point before the end of the notebook's useful life."

17

(*Rutledge*, *supra*, 238 Cal.App.4th at p. 1168.)  The plaintiffs argued "HP had a duty to disclose the material fact that the inverters were defective in manufacturing and installation" because "consumers expect a notebook computer to be portable, and a properly working display screen is essential to the notebook's portability." (*Id.* at p. 1173.)  In response, HP argued manufacturers do not have a duty to disclose "a product defect absent an unreasonable risk of 'physical injury or safety concerns,' " which was not present.  (*Id.* at pp. 1173–1174.)  The court rejected HP's argument. Although the HP computers did not immediately malfunction like those in *Collins*, the plaintiffs alleged the "inverters were defective in manufacturing and installation at the time the notebooks were sold" and thus were " 'substantially certain to fail' " at some point in the future.  (*Rutledge*, at p. 1175.)  The plaintiffs sufficiently alleged this defect to be "material, because it affected the performance of the display screens of notebook computers." (*Ibid.*)

Both *Collins* and *Rutledge* emphasized "neither *Daugherty* nor *Bardin* preclude a duty to disclose material information known to a manufacturer and concealed from a consumer." (*Rutledge*, *supra*, 238 Cal.App.4th at p. 1174; accord *Collins*, *supra*, 202 Cal.App.4th at p. 258.)  Rather, these cases found *Daugherty* and *Bardin* distinguishable as involving nonmaterial defects.  They noted the engine defect in *Daugherty* was due to normal use and wear and did not manifest, if at all, until long after the warranty limits. (*Collins*, at pp. 256–257; *Rutledge*, at p. 1175.)  *Collins* likewise distinguished *Bardin* by noting "the composition of the exhaust manifolds was an insignificant matter" and consumers had no expectations about the composition.  (*Collins,* at p. 257; *Rutledge*, at p. 1175.)

There are certainly points of distinction between the present case and *Rutledge* and *Collins*. *Collins*, in particular, involved computers that were never complete and operational due to the alleged microchip defect at the time they were sold. (*Collins*, *supra*, 202 Cal.App.4th at p. 257.) But these cases provide important guidance on when a defendant may be subject to a duty to disclose.

In *Hodsdon v. Mars, Inc.* (9th Cir. 2018) 891 F.3d 857 (*Hodsdon*), the Ninth Circuit summarized the holdings in *Rutledge* and *Collins*, noting those cases sanctioned an "omission claim when: the plaintiff alleges that the omission was material; second, the plaintiff must plead that the defect was central to the product's function; and third, the plaintiff must allege one of the four *LiMandri*[8] factors." (*Hodsdon*, at p. 863, citing *Collins*, 202 Cal.App.4th at pp. 255–256.) The *LiMandri* factors are as follows: " '(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts.' " (*LiMandri*, *supra*, 52 Cal.App.4th at p. 336.) The *Hodsdon* court relied on these opinions to conclude an omission only needed to relate to the central functionality of the products rather than constitute a safety hazard. (*Hodsdon*, at p. 863.) Recently, the Fifth Appellate District acknowledged omissions of material fact are actionable under the CLRA and UCL. (See *Gutierrez*, *supra*, 19 Cal.App.5th at pp. 1258, 1266.) The *Gutierrez* court considered whether the duty to disclose safety concerns constituted an additional, "*independent* duty of disclosure," but

---

[8] *LiMandri v. Judkins* (1997) 52 Cal.App.4th 326 (*LiMandri*).

ultimately concluded it was merely "a specific application of the duty to disclose" when one of the *LiMandri* factors are met. (*Gutierrez*, at pp. 1258, 1260.)

We follow *Collins*, *Rutledge*, and *Hodsdon* in concluding omission claims are viable provided they relate to the product's central functionality. However, we are cognizant of the concerns about undermining warranties and thus emphasize the necessary limits in assessing whether a defect is central to functionality. *Collins*, for example, allowed claims to proceed based on allegations that a chip error resulted in corrupting data on the user's floppy disk. (*Collins*, *supra*, 202 Cal.App.4th at p. 258.) In *Rutledge*, laptop screens failed entirely, thus requiring them to be connected to an external monitor and undermining the portability of laptops. (*Rutledge*, *supra*, 238 Cal.App.4th at p. 1175.) In both instances, the defects either totally or significantly impacted the product's primary use. Conversely, the Northern District of California concluded a failure to include fans and vents in certain computers, resulting in debris causing permanent dark smudging on screens, was not central to a computer's functionality. (*Ahern v. Apple Inc*. (N.D.Cal. 2019) 411 F.Supp.3d 541, 568.) Likewise, security vulnerabilities in a microprocessor did not give rise to a duty to disclose because "the allegations do not go to the central functionality of a microprocessor and do not show that the chips were incapable of use." (*In re Intel Corp. CPU Mktg., Sales Practices & Prod. Liab. Litig*. (D.Or. Mar. 27, 2020, No. 3:18-md-2828-SI) 2020 WL 1495304 at p. *17.)

Here, the alleged defect is the premature failure of the hard drives. Seagate does not appear to contend the drives that prematurely fail have any remaining functionality. Accordingly, the alleged high rate of premature failure goes to the heart of the drive's functionality. Nalick's pre- and

postwarranty claims may proceed provided he can meet the *LiMandri* test and demonstrate materiality and exclusive knowledge by Seagate.[9]

With regard to the *LiMandri* test, Nalick argues he can demonstrate a duty to disclose arising from partial representations made by Seagate. Seagate disagrees, arguing the trial court did not certify class claims based on affirmative misrepresentations. Undoubtedly, the class certification order expressly limited class claims to those "based on omissions." However, omissions claims—i.e., those based on a failure to disclose—can encompass situations "when the defendant makes partial representations that are misleading because some other material fact has not been disclosed." (*Collins*, *supra*, 202 Cal.App.4th at p. 255, citing *LiMandri*, *supra*, 52 Cal.App.4th at p. 336; see also *Gutierrez*, *supra*, 19 Cal.App.5th at p. 1260; *Hodsdon*, *supra*, 891 F.3d at p. 863.) And the trial court's class certification order acknowledged as much by restating Nalick's omission-based theory of liability as follows: " '[P]roof of liability turns on whether the average consumer purchasing the Drive would be likely to be deceived by Seagate's representations about the Drives' reliability and its omission of the Drives' failure rates. Because Seagate uniformly concealed the true failure rates of the Drive—*while prominently featuring the Drive's reliability on its website,*

_____

[9] Seagate also argues any claims arising during the warranty period should be barred because, unlike in *Daugherty*, Nalick did not assert any claim based on the language of Seagate's warranty. But Seagate does not cite any authority to support its position that the CLRA and UCL cannot encompass claims arising during a warranty period. To the contrary, the fact that claims occurred during the warranty period was an express factor in the *Collins* court decision. (See *Collins*, *supra*, 202 Cal.App.4th at p. 257 ["The complaint before us is unlike *Daugherty* because it does not attempt an end-around the warranty laws. In the complaint, plaintiffs allege: 'Both named Plaintiffs suffered data loss and missing files when using their floppy disk drive, during and before the warranty expired.' "].)

21

*in its marketing, and on its boxes*—the Class was exposed to the same deceptive course of conduct.' " (Italics added.) While the trial court did not certify class claims based on a latent defect or affirmative misrepresentation, nothing in its order limited how Nalick may prove his omissions-based claims.

### 2. *Materiality and Exclusive Knowledge*

We next turn to whether the record reflects a genuine issue of material fact regarding at what level AFR's become material and whether Seagate had exclusive knowledge of such AFR's.

Expert declarations opposing summary judgment must be " 'liberally construed.' " (*Fernandez*, *supra*, 31 Cal.App.5th at p. 779.) However, a liberal construction does not "eliminate the need for some form of 'reasoned explanation,' and it remains the case that any inferences must 'reasonably be derived from' the declaration." (*Id*. at p. 782.) Trial courts may inquire into both the type of material on which an expert relies and whether that material actually supports the expert's reasoning. (*Sargon*, *supra*, 55 Cal.4th at p. 771.) The trial court's focus should be " 'solely on principles and methodology, not on the conclusions that they generate.' " (*Id*. at p. 772.) An appellate court reviews for abuse of discretion a trial court's ruling excluding or admitting expert testimony. (*Id*. at p. 773.)

Nalick does not dispute the trial court's holding that Seagate met its initial burden by showing a reasonable consumer would not find any difference between an AFR of less than 1 percent and an AFR of 8 percent. Rather, Nalick asserts the evidence he presented creates a genuine issue of material fact as to whether failure rates in excess of 1 percent were material to a reasonable consumer.

22

Nalick first argues industry standards and Seagate's own reliability specifications for hard disk drives require an AFR of 1 percent or less. While possibly true, we agree with the trial court that evidence regarding industry standards for AFR's and Seagate's reliability specifications do not alone provide evidence of consumer expectations. Likewise, we agree with the trial court that Nalick's criticism of the methodology Seagate used in its consumer study to conclude an 8 percent AFR was immaterial to consumers does not, by itself, provide evidence of what AFR would be material to a reasonable consumer.

However, we disagree in part with the trial court's interpretation of Boedeker's declaration. The trial court noted Boedeker's opinions were based on a consumer survey, data from which was used to quantify the drop in consumer demand for hard drives with heightened AFR's. The court further noted the lowest AFR for which Boedeker offered a quantitative opinion on economic loss was 3 percent, and it thus determined his declaration demonstrated "an [AFR] of as low as 3% is material to a reasonable consumer, but is not evidence of materiality as to any lower annual failure rate." In reaching its conclusion, the trial court rejected Seagate's argument that Boedeker did not measure the materiality of AFR's. It noted Boedeker's survey addressed AFR's at various increments, Boedeker used this data to analyze AFR's "between 1% and 10% through interpolation," Boedeker's method of interpolation was appropriate, and "evidence that consumers would have paid less for a product if one attribute of the product were changed is evidence that the attribute is material."

The trial court did not abuse its discretion in concluding Boedeker's declaration was admissible and affirming his methodology to show evidence of materiality. (See *Sargon*, *supra*, 55 Cal.4th at p. 772.) Nor does Seagate

23

assert the trial court abused its discretion in doing so. However, the trial court exceeded its role by adopting its own interpretation of Boedeker's conclusions. (See *ibid.*) The trial court provided no explanation for its determination that only AFR's at or above 3 percent are material. Perhaps the trial court utilized 3 percent because that was the lowest AFR for which Boedeker provided a quantitative number for economic loss. However, Boedeker's declaration did not conclude an AFR of 3 percent was the first level at which consumers would experience economic loss. To the contrary, Boedeker expressly stated "the model can be further refined to enable the quantification of economic losses for different interim AFRs," including "the specification of economic losses for all incremental AFRs between 1% and 50%." Boedeker's declaration thus indicates consumers experience some degree of economic loss for AFR's above 1 percent, and—per the methodology approved by the trial court—that economic loss corresponds to a degree of materiality. Additionally, Boedeker found "the [AFR] is by far the most important attribute" for survey participants. While a jury may ultimately conclude only a certain level of economic loss evidences materiality, we must interpret Boedeker's declaration liberally. (See *Fernandez*, *supra*, 31 Cal.App.5th at p. 779.) Accordingly, Boedeker's declaration provides sufficient evidence of materiality for AFR's above 1 percent to raise a genuine issue of material fact.

Because Nalick has offered evidence to raise a genuine issue of material fact as to whether AFR's over 1 percent are material, we need not resolve the parties' dispute regarding Elerath's declaration. Putting aside Elerath's declaration, the record contains sufficient evidence to raise a factual dispute regarding whether Seagate had knowledge of hard drives with AFR's over 1 percent. As noted by the trial court in its initial order on summary

24

judgment, the Trane and Ng declarations submitted by Seagate "identify return rates that were in excess of 1% per year over the first two years, even, in Trane's case, when 'No Trouble Found' and 'Could Not Duplicate' returns are excluded." The trial court's initial order thus correctly determined "a trier of fact presented with Seagate's evidence could conclude that at least some of the drive families at issue here had AFR's in excess of 1% and that Seagate knew of those AFR's as a result of return data."

In sum, Boedeker's declaration sufficiently raises a triable issue as to whether AFR's over 1 percent are material to a reasonable consumer, and Seagate's own evidence raises a triable issue as to whether it had knowledge of AFR's above 1 percent. Together, Nalick has adequately disputed Seagate's motion for summary adjudication of the class claims.

## III. DISPOSITION

The trial court's order granting summary adjudication is reversed, and the matter is remanded for further proceedings consistent with this opinion. Plaintiff Scott Nalick may recover his costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

MARGULIES, J.


WE CONCUR:


HUMES, P. J.


SANCHEZ, J.


A158237
*Nalick v. Seagate Technology LLC*

26